IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DONNA J. DAVIS,**                                               Case No. 1:16 CV 2446

    Plaintiff,

    v.                                                  Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                              MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Donna Davis ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 20). For the reasons stated below, the undersigned reverses the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in May 2013, alleging a disability onset date of December 17, 2012. (Tr. 368-75). His claims were denied initially and upon reconsideration. (Tr. 308, 312, 321, 328). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 335). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on December 16, 2014. (Tr. 197-243). On February 26, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 181-91). The Appeals Council denied Plaintiff's request for

review, making the hearing decision the final decision of the Commissioner. (Tr. 9-15); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on October 5, 2016. (Doc. 1).

**FACTUAL BACKGROUND**[1]

Personal Background and Testimony

Plaintiff was born in May 1964, making her 48 years old at the time of her disability onset date, and 50 years old at the time of the ALJ's decision. *See* Tr. 207. She had past work as a nurse's assistant and day care worker. *See* Tr. 189, 234, 401. Plaintiff alleged disability due to depression, anxiety, borderline bipolar disorder, personality disorder, undiagnosed breathing problems, and back and shoulder problems. (Tr. 400). Plaintiff testified she had a ninth grade education with additional training as a nursing assistant. (Tr. 207-08). Plaintiff lived in a house with her daughter, and her daughter's four young children. (Tr. 208-09). Plaintiff received long term disability benefits though her previous employer, but they were expiring. (Tr. 209).

Plaintiff had a spinal fusion in 2009, with some improvement. (Tr. 222-23). At the hearing, Plaintiff testified to back pain beginning after helping lift some boxes and furniture. (Tr. 210). She reported back pain for three years, with shooting pains down her leg since December 2011. *Id.* Plaintiff also reported her back was causing "problems with [her] hip" (Tr. 214) and experienced pain and numbness in her right leg and foot (Tr. 210). Plaintiff had difficulty walking due to her hip, back, and knee pain. (Tr. 223-24). Plaintiff had received pain blocks from Dr. Costandi, but "they've never helped". (Tr. 218); *see also* Tr. 219 (noting that the pain blocks "give[] [her] a little

---

1. Plaintiff challenges only the ALJ's consideration of medical opinion related to her physical impairments. Plaintiff waives argument on issues not raised in the opening brief. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). As such, the undersigned summarizes only the relevant records and testimony.

bit of relief, and it comes right back within a few days"). She also testified that her physician did not "believe in pain medication". (Tr. 218). Therefore, she took Tylenol and Advil for pain. (Tr. 222). Her hip and back pain affected her sleep. (Tr. 224). Plaintiff had recently switched physicians and was going to "the Spine Institute." (Tr. 218-19). She was also undergoing aquatic therapy. (Tr. 227).

Plaintiff also testified to right shoulder problems. (Tr. 214). Her shoulder problems had improved after a surgery, but it was "starting to act up real bad again". *Id.* Her right shoulder problems prevent her from doing the dishes. (Tr. 221). She had difficulty reaching overhead, as well as moving her arm forward and backward. (Tr. 221-22).

Plaintiff estimated could sit for about fifteen minutes before needing to "get up and stretch" or "walk around a little bit". (Tr. 217). She could walk for "about 10, 15 minutes" before the pain became "so intense, it's not even funny." *Id.* At that point, she would "just walk around and - - or sit back down or whatever that - - that will give [her] a little relief". (Tr. 218). Plaintiff was most comfortable sitting in her recliner with her legs elevated. (Tr. 229). Plaintiff did not do "too much" around the house, specifically noting that she could not vacuum, sweep, or mop. (Tr. 225). If she did any dishes, she would just do her own. *Id.* She drove to medical appointments, which were approximately 10 minutes away, and these drives caused pain. (Tr. 226).

Relevant Medical Evidence

*Prior to Alleged Onset Date*

In August 2011, Plaintiff saw orthopedic specialist Mark Hatheway, M.D., for right shoulder pain. (Tr. 540). She reported having the pain for about a year, increasing over the prior four months. *Id.* On examination, Dr. Hatheway noted tenderness, pain with range of motion, and positive impingement signs. *Id.* He suspected a rotator cuff tear. *Id.* An MRI showed tendinosis,

3

degenerative joint disease, and effusion. (Tr. 542). The following month, Dr. Hatheway diagnosed right shoulder impingement syndrome and provided an injection and pain medication. (Tr. 539).

In January 2012, Plaintiff received another injection, and Dr. Hatheway prescribed Vicodin for pain. (Tr. 538). Plaintiff f returned to Dr. Hatheway in April 2012, reporting right elbow, as well as shoulder pain. (Tr. 537). She received another right shoulder injection, and Dr. Hatheway provided "a tennis elbow strap" that Plaintiff could wear at work. *Id.* Plaintiff again received injections in her right shoulder and elbow in September and early December 2012. (Tr. 535-36).

A few days prior to her alleged onset date, Plaintiff saw her primary care physician, Julia Stokes, M.D. (Tr. 471-72). She reported hypothyroidism and depression (both doing well), and some shortness of breath with exertion. (Tr. 471). She was working as a nursing assistant. *Id.*

*After Alleged Onset Date*

A few days later, Plaintiff returned to Dr. Stokes, complaining of low back and right leg pain after moving boxes. (Tr. 468-69). The pain radiated to her right lateral hip and thigh, and she had tingling and numbness which had caused her to fall. (Tr. 468). On examination, Dr. Stokes noted tenderness in the back, a positive straight leg raising test on the right, and normal lower extremity strength and reflexes. *Id.*Dr. Stokes assessed back pain and sciatica, prescribed Vicodin and Prednisone, and ordered x-rays. (Tr. 469).

A January 2013 lumbar spine MRI revealed: postsurgical changes compatible with right hemilaminotomy at L4-L5; severe right foraminal stenosis at L4-L5 secondary to a broad-based right foraminal disc protrusion as well as facet disease; mild central canal stenosis at L4-L5; a suspected small free disc fragment/sequestration located posterior to the L3 vertebral body on the right side within the ventral epidural space, with probable impingement upon the right L3 nerve root; and shallow broad disc-osteophyte complex at L1-L2 eccentric to the left resulting in mild

4

left lateral stenosis. (Tr. 488). A February 2013 chest x-ray showed mild degenerative changes in the thoracic spine. (Tr. 485).

Also in February 2013, Plaintiff saw neurosurgeon Joseph Shehadi, M.D. twice. (Tr. 493-500, 504-09). At the first visit, Plaintiff reported an eight-month history of low back pain radiating into her right leg. (Tr. 493). Plaintiff reported her pain level as ten out of ten, and aggravated by physical activity, as well as prolonged sitting and standing. *Id.* She reported difficulty with bathing, climbing stairs, housekeeping, getting up and down from a chair, lifting or carrying, shopping, and traveling. (Tr. 494). On examination, Plaintiff had a normal gait and station, normal reflexes, and full and symmetrical muscle strength in all extremities. (Tr. 495). Dr. Shehadi assessed degenerative disc disease/annular tears, lumbar; low back pain; radicular syndrome of lower limbs; and spinal stenosis, lumbar region. *Id.* He recommended "conservative therapy" including pain medication and physical therapy. (Tr. 496). At the second visit with Dr. Shehadi, Plaintiff reported having tried physical therapy, but reported it wasn't helping. (Tr. 497). Dr. Shehadi continued his assessments, advised Plaintiff to lose weight, and continue physical therapy (aqua therapy) and analgesics. (Tr. 499-500). He also noted he would consider a lumbar epidural steroid injection, a right lower extremity EMG nerve conduction study, and an "LSO brace" (Tr. 500).

Plaintiff also returned to Dr. Hatheway in February 2013, reporting severe pain in her right shoulder and right elbow. (Tr. 534). She reported the December 2012 injection had provided no relief, and she wanted to proceed with surgery. *Id.*

Plaintiff underwent a lumbar spine CT, which showed normal alignment with some narrowing and stenosis at L4-L5, and disc bulge at L1-L2, L2-L3, L3-L4, and L5-S1. (Tr. 501-02). A chest x-ray showed mild degenerative changes of the thoracic spine unchanged from the September 2012 imaging. (Tr. 485).

5

In March 2013, Plaintiff underwent a right shoulder arthroscopy with subacromial decompression and distal clavicle resection, and a Bosworth procedure of the right elbow. (Tr. 543-45). Follow-up notes from March and April 2013 indicate Plaintiff was doing well, and doing an exercise program at home (she could not do physical therapy due to an insurance coverage lapse). (Tr. 532-33). She was prescribed pain medication during this time. (Tr. 431).

In May 2013, Plaintiff sought to establish care with a new primary care provider because she had moved. (Tr. 707). She reported worsening back pain, radiating to the right foot and left thigh. (Tr. 706). On examination, Maryum Zohair, M.D., found a normal gait and mild pain with motion in Plaintiff's lumbar spine. (Tr. 708). She prescribed Neurontin and referred Plaintiff to pain management. (Tr. 708-09).

In July 2013, Plaintiff saw Shrif Costandi, M.D., at the Cleveland Clinic Pain Management Center. (Tr. 676-79). She reported lower back pain radiating to both hips, the right calf, and left thigh, with a duration of two and a half months. (Tr. 677). On examination, Dr. Costandi found Plaintiff had no pain on palpation of the lumbar spine, full range of motion, and negative straight leg tests; but also had tenderness over the lumbar paraspinal muscles, and pain with flexion and extension. (Tr. 678). Dr. Costandi diagnosed degenerative disc disease, neuritis, and postlaminectomy syndrome of the lumbar region. (Tr. 679). He recommended physical therapy, and did not recommend long term opioid therapy. *Id.* Dr. Costandi prescribed amitriptyline "to help control the pain and restore the sleep cycle", and noted he would consider a series of three causal epidural steroid injections "to alleviate pain and facilitate physical therapy." *Id.*

In August 2013, Dr. Costandi administered an L4-L5 lumbar interlaminar epidural steroid injection. (Tr. 674-75). After, he recommended Plaintiff continue physical therapy, and return in three to four weeks "for repeat of procedure if indicated." (Tr. 675).

Plaintiff then underwent a physical therapy spine evaluation at Cleveland Clinic Rehabilitation and Sports Therapy in August 2013. (Tr. 669-72). The therapist noted moderate limitation in lumbar flexion, and major limitation in lumbar extension. (Tr. 671). Plaintiff also had moderate limitation in "sideglide" and "sidebend" to both sides; but she had minimal limitation in rotation. *Id.* The therapist also noted hip flexion was "3-/5 with pain", but knee flexion and extension were "5/5". *Id.* The therapist noted Plaintiff's pain increased, and she experienced right leg numbness with laying supine with straight legs. *Id.*

Plaintiff had a second physical therapy visit in September 2013. (Tr. 667-68). Plaintiff had less than full strength in her legs. (Tr. 668). She also had increased muscle tone to bilateral lumbar paraspinals. *Id.*

In October 2013, Plaintiff returned for a second steroid injection. (Tr. 690). She reported the 75% relief for four days after the previous injection. *Id.* Dr. Costandi again recommended Plaintiff continue physical therapy. *Id.* He instructed Plaintiff to return for an office visit in four to six weeks, and discussed "the option of SCS and Spine Surgery." *Id.*

A few days later, Plaintiff underwent physical therapy, reporting that the second injection had not provided much change in her pain. (Tr. 663). The therapist noted no functional gains, and recommended water therapy. *Id.*

Plaintiff returned to Dr. Costandi in November 2013. (Tr. 655-57).[2] Plaintiff reported worsening pain, and that she had 5 days' relief of pain from the first injection, and none from the second. (Tr. 655). On examination, Dr. Costandi noted tenderness over the bilateral lumbar paraspinal muscles, and pain with flexion and extension of the lumbar spine. (Tr. 656). Dr.

---

2. This record is duplicated at Tr. 779-80.

Costandi continued Neurontin and amitriptyline, instructed Plaintiff to continue physical therapy, and noted he would "consider SCS trial in the future" and "[c]onsider TENS". (Tr. 656-57).

In April 2014, Plaintiff saw Norberto Juan, M.D., complaining of a cough and right hip pain. (Tr. 698-701). On examination, Dr. Juan noted normal range of motion, muscle strength, and stability in all extremities. (Tr. 701). Dr. Juan ordered a right hip x-ray, *id.*, which was unremarkable (Tr. 760).

In June 2014, Plaintiff returned to Dr. Costandi reporting worsening pain. (Tr. 783). Dr. Costandi noted Plaintiff had "[f]ailed to respond to medications, injections" and that a "TENS [unit] help[ed] when it [was] on." (Tr. 784). He recommended a "series of 2 diagnostic and possibly therapeutic bilateral lumbar facet medial branch blocks", possibly followed by "radiofrequency ablation of bilateral lumbar facet medial branch". (Tr. 784-85).

In August and September 2014, Dr. Costandi performed the first two blocks. (Tr. 787-92). Also in August 2014, Plaintiff reported worsening hip pain radiating to her back to Dr. Juan. (Tr. 741). Dr. Juan referred Plaintiff to orthopedics. *Id.* A chest x-ray later that month showed mild thoracic spondylosis. (Tr. 761).

In September and October 2014, Plaintiff underwent physical therapy for her hip pain. (Tr. 806-07). She reported having a lumbar injection "which did not help". (Tr. 806). Examination showed limitation in range of motion and strength in Plaintiff's hips. (Tr. 806-07). Plaintiff was discharged from physical therapy "[d]ue to maximal PT benefit and lack of improvement." (Tr. 807). It was noted she had been seen once a week for four weeks. *Id.*

In October 2014, Plaintiff saw Joseph George, Jr., M.D., the physician who had referred her to physical therapy. (Tr. 810-11); *see also* Tr. 806 (noting Dr. George was referring provider). On examination, Dr. George found Plaintiff had "marked pain on palpation over the greater

trochanter of the right hip", tenderness to palpation "at the vastus medialis only" and minimal effusion. (Tr. 810). Dr. George assessed tronchanteric bursitis as well as hip pain "which is not originating from the hip joint". *Id.* Plaintiff was "frustrated" and requested to see a spine specialist. *Id.* Dr. George interpreted an x-ray of Plaintiff's right knee as showing minor medial compartment, but not where her pain was. *Id.*; Tr. 812 (radiologist's reading of x-ray as "normal"). He prescribed "a Medrol Dosepak to settle her pain down", and then Naprosyn to follow. (Tr. 810).

*Opinion Evidence*

In June 2013, state agency physician Leigh Thomas, M.D., reviewed Plaintiff's records. (Tr. 257-59). She opined Plaintiff could: occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and stand, walk, or sit for about six hours in an eight-hour workday. (Tr. 257-58). She opined Plaintiff could frequently climb ramps or stairs, balance, kneel, crouch, or crawl; but she could only occasionally stoop, and never climb ladders, ropes, or scaffolds. (Tr. 258). She could occasionally reach overhead on the right side. (Tr. 258-59).

In July 2013, physical therapist Marilyn Beat, P.T., evaluated Plaintiff and completed a "Functional Capacities Evaluation". (Tr. 617). On examination, Ms. Beat noted Plaintiff had 4/5 strength in her upper and lower extremities. (Tr. 618). Her trunk range of motion was "25% of normal in all directions". *Id.* She noted decreased ranges of motion in Plaintiff's shoulders, elbows, and hips. *Id.* She opined Plaintiff could: stand up to two hours per eight-hour day (fifteen minutes at one time); sit up to two hours per eight-hour day (fifteen minutes at one time); and walk "occasional[ly][3]." (Tr. 620). She opined Plaintiff could rarely bend, reach overhead, squat, kneel, or do repetitive leg movements. *Id.* Ms. Beat opined Plaintiff could frequently lift and carry five pounds, occasionally lift and carry ten pounds, and occasionally balance. *Id.* Ms. Beat opined

---

3. The form defined "occasional" as "1-33% of day". (Tr. 620).

9

Plaintiff was "[u]nable to work as STNA", demonstrated "significant" pain disability behavior, and demonstrated "validity of effort." *Id.* Ms. Beat identified Plaintiff's "physical demand classification" as "sedentary." (Tr. 619). The form contained a line for a physician signature, which was left blank. (Tr. 620).

In November 2014, physical therapist Pat Carey, P.T., evaluated Plaintiff and completed a "Functional Capacities Evaluation". (Tr. 797-801). Ms. Carey found decreased lower extremity strength, decreased shoulder strength, and some reduced range of motion in the shoulders, hips, and trunk. (Tr. 798). She observed Plaintiff sat and stood for 10 minutes, and opined that her physical demand classification was "sedentary." (Tr. 799). She opined Plaintiff could stand for four hours in an eight-hour day (fifteen minutes at a time), and sit for four hours in an eight-hour day (fifteen minutes at a time). (Tr. 800). She also opined Plaintiff could "occasional[ly][4]" walk. *Id.* She opined Plaintiff could lift and carry fifteen pounds occasionally, and seven pounds frequently. *Id.* She could occasionally stoop, and never balance. *Id.* Finally, she noted Plaintiff's pain disability behavior was "significant" and that she demonstrated validity of effort. *Id.* The form contained a line for a physician signature, which was left blank. (Tr. 801).

In December 2014, state agency physician Gary Hinzman, M.D., reviewed Plaintiff's records and affirmed Dr. Thomas's opinion. (Tr. 286-87).

VE Testimony

When asked to consider an individual limited in the manner ultimately found by the ALJ, the VE testified such an individual could perform work as a small products assembler, inspector and hand packager, and electronics worker. (Tr. 234-36). The VE also testified that if the individual

---

4. The form again defined "occasional" as "1-33% of day". (Tr. 800).

were off task fifteen to twenty percent of the time, or if she needed to change positions every ten to fifteen minutes, she could not sustain competitive employment. (Tr. 237-38).

ALJ Decision

In his written decision, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016, and had not engaged in substantial gainful activity since December 17, 2012, the alleged onset date. (Tr. 183). He found Plaintiff had severe impairments of: "osteoarthrosis and allied disorders, DDD (disorders of back-discogenic and degenerative), and affective disorder", but that these impairments did not meet or medically equal the severity of the listed impairments either individually or in combination. (Tr. 183-84). The ALJ then concluded Plaintiff had the residual functional capacity:

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional limitations: lift or carry 20 pounds occasionally and 10 pounds frequently, stand or walk 6 hours out of an 8 hour workday; sit 6 hours our [sic] of an 8 hour workday; frequently climb ramps or stairs; never climb ladders, ropes or scaffolds; occasionally stoop; frequently kneel, crouch or crawl; [and] occasionally reach overhead with the right upper extremity[.]

(Tr. 185).[5]

The ALJ then determined Plaintiff could not perform any past relevant work, but considering her age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (Tr. 189-90). Therefore, the ALJ concluded Plaintiff was not disabled. (Tr. 191).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

---

5. The RFC also included mental limitations, which are not at issue. *See* Tr. 185; *see also* Doc. 13, at 4 n.1 (noting Plaintiff is not challenging the ALJ's mental health determination).

correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

> 5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff presents a single argument for review: that the ALJ erred in rejecting the opinion evidence provided by two physical therapists when he rejected those opinions based solely on the fact that physical therapists are not "acceptable medical sources" under the regulations. The Commissioner responds that the ALJ did not err.

Social Security regulations state that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. §§ 404.1527(c), 416.927(c). A "medical opinion" is defined by regulation as a "statement[] from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairments . . . ." *Id.* at §§ 404.1527(a)(2), 416.927(a)(2). "Acceptable medical sources" includes licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. *Id.* at §§ 404.1513(a)(1)-(5); 416.913(a)(1)-(5). The relevant Social Security Regulation also explains:

13

> The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. See 20 CFR 404.1513(a) and 416.913(a). Second, only "acceptable medical sources" can give us medical opinions. See 20 CFR 404.1527(a)(2) and 416.927(a)(2). Third, only "acceptable medical sources" can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight. See 20 CFR 404.1527(d) and 416.927(d).
>
> Making a distinction between "acceptable medical sources" and medical sources who are not "acceptable medical sources" facilitates the application of our rules on establishing the existence of an impairment, evaluating medical opinions, and who can be considered a treating source.

SSR 06-03p, 2006 WL 2329939, at *2.[6]

Opinions from those who are not "acceptable medical sources"—or as the regulations define them, "other sources"—may be used by an ALJ to "show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. §§ 404.913(d), 416.1513(d); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Other source opinions are entitled to consideration by an ALJ, and an ALJ's decision should reflect such consideration. *Cole v. Astrue,* 661 F.3d 931, 939 (6th Cir. 2011); *see also* SSR 06-03p, 2006 WL 2329939, at *3 (explaining "other source" opinions "are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file"). In other words, an ALJ "should explain the weight given to [such] opinions ... or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6; *see also Cruse,*

---

6. SSR 06-03p was rescinded effective March 27, 2017, *see Notice of Rescission of Social Security Rulings*, 82 Fed. Reg. 15263-01 (March 27, 2017), but was in effect at the time of the ALJ's decision, and as such, applies here.

502 F.3d at 541. As one court explained, "[t]he Sixth Circuit . . . appears to interpret the phrase 'should explain' as indicative of suggesting that the ALJ explain the weight [given to an 'other source' opinion], as opposed to leaving the decision whether to explain to the ALJ's discretion". *Hatfield v. Astrue*, 2008 WL 2437673, at *3 (E.D. Tenn.) (citing *Cruse*, 502 F.3d at 541-42).

"SSR 06-03p . . . does not require that an adjudicator articulate 'good reasons' for the rejecting of an 'other source's' opinion[,]" as the ALJ must do when discounting an opinion by a treating source. *York v. Comm'r of Soc. Sec.,* 2014 WL 1213240, at *5 (S.D. Ohio) (citations omitted); *see also Clark ex rel. S.R.C. v. Comm'r of Soc. Sec. Admin.*, 2013 WL 3007154, at *9 (N.D. Ohio) ("An ALJ is not required to set forth good reasons for rejecting the opinion of a social worker."). Nor is an "other source" opinion "entitled to any special deference." *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 558 (6th Cir. 2014). And, an ALJ has "broad discretion" in weighing "other source" opinion. *Brown v. Comm'r of Soc. Sec.*, 591 F. App'x 449, 451 (6th Cir. 2015).

However, to evaluate other source opinions, an ALJ should apply the factors set forth in 20 C.F.R. §§ 404.1527(c) and 419.927(c), *i.e.,* length of treatment history; consistency of the opinion with other evidence; supportability; and specialty or expertise in the medical field related to the individual's impairment(s). *Adams v. Colvin*, 2014 WL 5782993, at *8 (S.D. Ohio); SSR 06-03p, 2006 WL 2329939, at *4-5. And, "[g]iven this guidance, 'it will rarely be enough for the commissioner to silently "consider" the above-mentioned factors in deciding how much weight to give to an "other source" who has seen the claimant in the source's professional capacity." *Hirko v. Colvin*, 2016 WL 4486852, at *3 (N.D. Ohio) (quoting *Estep v. Comm'r of Soc. Sec.*, 2016 WL 1242360, at *3 (E.D. Mich.)).

Here, the analysis provided by the ALJ was as follows:

> [O]n July 12, 2013, a physical therapist completed a Functional Capacity Evaluation of the claimant after referral by Maryum Zohair, M.D. (Exhibits 10F

15

and 16F). The physical therapist noted decreased standing, sitting and lift/carry tolerance, decreased upper, lower and trunk strength, and decreased range of motion in the upper and lower extremities (Exhibits 10F and 16F). After conducting the evaluation, the physical therapist indicated the claimant was in a physical demand classification of sedentary, showed significant pain disability behavior, and is unable to work as a STNA (Exhibits 10F and 16F). The undersigned give [sic] no weight to the opinion of this physical therapist, as this therapist is not an "acceptable medical source" pursuant to 20 CFR 404.1513 and 416.913.

On November 5, 2014, physical therapist, Pat Carey, completed a Functional Capacity Evaluation of the claimant on referral by Dr. Noberto Juan (Exhibit 22F). The therapist noted the claimant complained of low back pain during all manual muscle testing and did not demonstrate maximal effort with grip and pinch testing (Exhibit 22F). Nonetheless, the therapist determined the claimant could stand 15 minutes at one time up to 4 hours in an 8-hour workday, sit 15 minutes at one time up to 4 hours in an 8-hour workday, and lift/carry up to 15 pounds occasionally and 7 pound [sic] frequently (Exhibit 22F). The therapist concluded that the claimant displayed significant pain disability behavior and ultimately, that the claimant is unable to work. Again, the undersigned give [sic] no weight to the opinion of this physical therapist, as this therapist is not an "acceptable medical source" pursuant to 20 CFR 404.1513 and 416.913.

(Tr. 188-89).

Thus, the *only* reason provided by the ALJ for rejecting these two opinions was because the physical therapists were not "acceptable medical sources." This is simply insufficient and does not comport with SSR 06-03p's requirement that an ALJ "explain the weight given to [such] opinions . . . or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6.

In *Cruse*, the Sixth Circuit examined an ALJ's rejection of a nurse practitioner's opinion because she was "neither a medical doctor nor a vocational expert, and thus lacks the credentials for making such a determination", and noted such an explanation "was devoid of any degree of specific consideration of [the] nurse practitioner['s] . . . functional assessments." 502 F.3d at 541. "Following SSR06-03p," the Sixth Circuit explained, "the ALJ should have discussed the factors

16

relating to his treatment of [the nurse practitioner's] assessment, so as to have provided some basis for why he was rejecting the opinion." *Id.*

Moreover, district courts within the Circuit (and elsewhere) have found that rejecting an "other source" opinion *solely* on the basis of its status as an "other source" opinion violates SSR 06-03p. *See Randazzio v. Comm'r of Soc. Sec.*, 2015 WL 881511, at *3 (S.D. Ohio) ("[A]fter determining Ms. Marshall's opinion was to be treated as 'other source' evidence, [the ALJ] conclusorily stated that it was 'accordingly' entitled to little weight. To the extent that the ALJ assigned Ms. Marshall's opinion little weight solely because she is not an acceptable medical source, or to the extent the ALJ did not realize he had the authority to assign Ms. Marshall's opinion great weight, the decision is inconsistent with SSR 06-03p and must be remanded."); *see also Edwards v. Comm'r of Soc. Sec.*, 2016 WL 54690, at *6 (W.D. Mich.) ("While the ALJ is not required to explicitly discuss each of the factors, the record must nevertheless reflect that the ALJ considered the factors relevant to his assessment."); *Estep.*, 2016 WL 1242360, at *3 ("[I]t will rarely be enough for the commissioner to silently 'consider the above-mentioned factors in deciding how much weight to give to an 'other source' who has seen the claimant in the source' professional capacity."); (internal record citations omitted); *Godwin v. Colvin*, 2017 WL 343641, at *6 (E.D. Wash.) ("It would be error for the ALJ to reject Mr. Wyatt's opinion solely because it was an 'other source' opinion, but it can properly be considered among other germane reasons."); *cf. Menough v. Comm'r of Soc. Sec. Admin.*, 2012 WL 3815625, at *7 (N.D. Ohio) ("Had the ALJ disregarded Ms. Pelletier's opinions solely because she was not an acceptable medical source, Plaintiff's objection might have teeth. Social Security Ruling 06-03p admonishes against such terse conduct and ensures claimants that all relevant evidence will be considered regardless of whether it was submitted from an acceptable medical source or from an 'other source'."); *Thiel v.*

17

*Berryhill*, 2017 WL 1207977, at *18 (N.D. Ohio) ("While the ALJ (correctly) recognized Ms. Clapham did not constitute an 'acceptable medical source' under social security regulations, the ALJ expressly acknowledged the requirement that he nevertheless evaluate and consider her opinion pursuant to SSR 06-03p. The ALJ then did exactly that[.]"), *report and recommendation adopted by* 2017 WL 1199097.

SSR 06-03p requires the Commissioner to address other source opinion "when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6. Such is the case here. The physical therapists' opinions were significantly more limiting than the ALJ's determination of Plaintiff's RFC. *Compare* Tr. 188 *with* Tr. 617-20 *and* Tr. 797-801. Both physical therapists opined Plaintiff could only sit or stand for fifteen minutes at one time. (Tr. 620, 800). And the VE testified that if an individual in Plaintiff's position needed to change position every ten to fifteen minutes, she could not sustain competitive employment. *See* Tr. 237-38. Thus, these opinions "may have [had] an effect on the outcome of the case" and the ALJ erred in not considering them.

Here, the ALJ's language implies he, like the ALJ in *Randazzio*, 2015 WL 881511, at *3, believed the opinions were entitled to no weight simply by virtue of the credentials of the opining source. But, as the above case law demonstrates, this is incorrect. The ALJ's language thus does not "ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6. Nor does the ALJ's opinion reflect he considered any of the required factors. *See* Tr. 188-89 ("[T]he undersigned give [sic] no weight to the opinion of this physical therapist, as this therapist is not an 'acceptable medical source' pursuant to 20 CFR 404.1513 and 416.913."). This is insufficient to satisfy the

dictates of SSR 06-03p, despite the "broad discretion", *Brown*, 591 F. App'x at 451, an ALJ has in weighing other source opinion. *See Randazzio*, 2016 WL 881551, at *3; *Edwards*, 2016 WL 54690, at *6; *Estep*, 2016 WL 1242360, at *3; *Hirko*, 2016 WL 4486852, at *33.

The Commissioner provides a lengthy analysis of reasons she contends the ALJ could have given to support his assignment of no weight to these opinions: 1) the opinions are based on Plaintiff's subjective complaints, which the ALJ properly found not credible; 2) the opinions were not well-explained; and 3) the factors (treating relationship, supportability, credibility, specialization) weigh against giving weight to these opinions. But these are not the reasons advanced by the ALJ, and are, rather, a post-hoc justification for the ALJ's conclusion. For the undersigned to adopt such an analysis would be improper. *See Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)) (a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely on the grounds invoked by the agency); *see also Bray v. Comm'r of Soc. Sec.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."). The ALJ did not offer these reasons, and it would be improper for the undersigned to rely on them.

It may be that the ALJ rejected these opinions for the reasons provided by the Commissioner. However, the Court cannot make that determination because the ALJ's decision does not permit this reviewing court to follow the reasoning and treatment of this evidence. *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 378-79 (6th Cir. 2013) (holding district court erred in presuming that therapist's opinion—not acknowledged in the ALJ's decision—was rejected because the findings in the opinion were reflected in a physician's opinion); *see also Boran ex rel.*

*S.B. v. Astrue*, 2011 WL 5122953, at *14 (N.D. Ohio) ("The mere citation to the opinions of [claimant's case workers] is not sufficient to satisfy SSR 06-03P because it does not allow a subsequent reviewer to follow the ALJ's reasoning in disregarding these opinions which might have had an effect on the outcome of the case."). Because the decision precludes meaningful judicial review, the Court cannot determine whether the decision is supported by substantial evidence.

For these reasons, the undersigned finds the Commissioner's decision violated SSR 06-03p, and must be reversed and remanded so the Commissioner can properly consider and discuss the physical therapists' opinions.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB not supported by substantial evidence and reverses that decision.

  s/James R. Knepp II
United States Magistrate Judge